Good morning everyone. We'll take the cases up in the order in which they appear on the docket. We're on a tight schedule today so I just want everybody now to watch their clocks and if you find yourself not having anything else to say, sit down. You don't have to fill up the time, okay? So the first two cases are submitted on the briefs. That's Quijano v. Bondi and Perez v. Bondi and we will take up Mateo-Mateo v. Bondi. So Mr. Jimenez. Yes, good morning your honors. May it please the court, my name is Mauricio Jimenez and I represent Ms. Mateo-Mateo. I'd like to reserve three minutes for rebuttal. Okay, watch your clock. This case involves four legal errors in the agency's decision. Before turning to the legal framework, I want to briefly address the factual record the agency relied upon. Counsel, before you do that, I have a couple of questions relating to the OSC that we issued for the initial brief that was filed containing false case citations and statements about what the case has said. So there are two questions that I have. One relating to the status of the lawyer who filed that brief. Is that counsel no longer, I understand that she withdrew as counsel of record for this case. Is she in fact no longer with your firm? That's correct, your honor. She resigned pending an evaluation of her practice management. Okay, I understand from the response to the OSC that there may have been other filings made by that lawyer that may have included some of the same errors and I trust that your firm is taking steps to review any filings made with this court that include improper citations. That's correct, your honor. Okay, and my second question has to do with, and I don't want to get into any attorney-client privilege information, but I guess this is more of a statement than a question, but I trust that your firm is taking adequate steps to disgorge fees that may have been paid by your client with respect to filings that were improper in this court. That's correct, your honor. We authorized a full refund in the matter, given the error. We also notified the petitioner of the order to show cause and the error committed. You understand the seriousness of a filing like that on behalf of a client that is relying on counsel to submit accurate and appropriate filings with this court is not only serious in terms of your representation of the client, but also for making misrepresentations to this court. Of course. I think you know that we could issue an order to show cause rate contempt. There's all sorts of other sanctions available. This is a serious issue in the courts. I was asked about it yesterday when I was speaking to a group of elite lawyers in Los Angeles, and we take this very seriously. There could have been worse consequences, but I also am concerned about the mental health of your, I don't know, former associate, and I hope someone is looking into that. Your honor, this is a very serious issue, and it severely impacted the firm in terms of its operations and re-evaluating AI protocols, what systems to use, what systems not to use, how to check peer review, reviewing the citations that are included. As for Ms. Rogers, I hold her in high regard, and I understand that this was a big mistake, but it's unfortunate in that that's what it was. She's very capable. She's smart. She's a great writer, and I can't explain the reasons for how this occurred. I think I have to refer back to her statement to the court, but I've maintained contact with her to try and just make sure that, one, we handle the cases that she had entered before appropriately, and of course, just in my practice, I try to help and guide those who are under my supervision. Okay, let's get to your client. Let's talk about whether or not, I mean, you have a client who is deemed credible, and the reason the BIA denied the claim was that it stated there was no nexus between the abuse and the purported protected ground, and also no showing that the government is unable or unwilling to protect. So can you address those issues? Yes, Your Honor. I believe in order to properly address those, I have to go back to the factual record, because we know what the immigration reviewed as he summarized those on the administrative record starting at 52. And so those facts describe that her partner, Mr. Martin, would pull her, kick her, punch her, hit her in the legs and arms, and even caused a broken wrist. So those factual items are not in dispute, but what's missing from that record and from the legal analysis that follows are, with respect to nexus, the record contains testimony describing an incident in which Mr. Martin justified his conduct by telling Ms. Mateo Mateo that she was a woman and should handle matters herself. That's on AR 141. The second issue is when Ms. Mateo sought police assistance to recover her child. The police told her to retrieve the herself rather than intervening. That's at AR 113. That response is highly relevant to whether the government was willing or able to provide protection to a victim who had already sought assistance from authorities. And then third, Ms. Mateo testified that Mr. Martin sent masked men to attempt to kidnap two of her children at AR 125. The agency noted uncertainty about the identity of the masked men, but I think that was missing the point as the record attributes that act to Mr. Martin himself. The testimony reflects that the continuing threats against her and the family lacked any meaningful intervention. And so those facts relate also to the nexus, right? The immigration judge relying, I believe, in matter of AB and some of the vdicta that was included on that decision found that it was a personal dispute, but it did not adequately consider the cultural context, which is also referenced in the country condition on AR 244, that the indigenous women in Guatemala are often subject to violence and that it remains widespread and is often tolerated within entrenched gender hierarchies. Counsel, does it matter at all that Alonso Martinez was abusive in general? I mean, he was hurting Pedro as well, his son, after he took him. You know, what are we to make of that? Because that became an issue for the IJ. I think it matters significantly because it shows the dominion over what he feels is his family and that extends to the petitioner, Ms. Mattel Mattel, and her children, right? Two of those children are derivatives on this case. She fled the country in large part because of fears of what he would do to those children and to her. But on the protected grounds, wasn't it the PSGs, weren't they? The common law married women and indigenous Mayan women. And what I'm against the PSG nexus finding. Well, respectfully, I would also ask the court to consider the Guatemalan women, which we proposed for the first time on appeal with the BIA. But I would find that it's a subset of those groups. All of the three petitioners, the writers are Guatemalan women as well. And so the findings of the facts, I understand matter of why WIC requires presentation of and delineation of the PSG to the immigration judge, but we're also in an area that constantly changes. It's moved before the judge, before the BIA. And again, during this petition for review. And so what we're seeing is if WIC allows an exception where it says generally they won't entertain PSGs on appeal, that's not categorical. And this is a case where an exception would be worth applying to consider not necessarily the facts because it doesn't change. It's based on gender, right? All of the PSGs include gender in some way. And so the finding of fact has been established. The question is whether it is a cognizable PSG. It's a mixed question of fact and law. And so it would have been appropriate in our argument for an appellate, the Board of Immigration Appeals, or for this panel to consider that as well. And I see I'm running close to the end of my time. Okay. Do you want to reserve the remainder? Yes, Your Honors. Thank you. Thank you. All right. Good morning. May it please the Court. Alexa Perlmutter on behalf of the Attorney General. As Your Honors pointed out, there are two independently dispositive issues before the Court, the unable or unwilling finding and the nexus finding and its petitioner's burden to identify evidence compelling a conclusion contrary to the agency's as to both in order to prevail. Beginning with the unable or unwilling finding, under this Court standard set out in Hussain, if the government is demonstrating efforts to subdue non-state actors, that satisfies the unable or unwilling finding. Here we have a decade of unfortunately unreported abuse. We then have three interactions with the police where on each occasion the police took steps to assist. And this is on pages 129 and 131 of the record. I'd like to just point out that the record 113 cited by opposing counsel, that was prior to cross-examination when petitioner was confronted with her own declaration, which states that the police did provide a protective order and that the police, again, when that order was not followed, stated that they would follow up themselves with another order. Furthermore, when the masked men, when petitioner reported the masked men to the police, she was unable to provide any identifying details as to those men other than that they had tattoos. And under this Court's decision in Truong, and several other cases when the government is not provided with sufficient information to conduct an investigation, that is not a basis to find the government was unable or unwilling to protect. I'd also like to point out on page 148 of the record that when petitioner sent these men, this was, she specifically says she doesn't know and it was just her guests and the guests of other people around her. Furthermore, the country conditions shows that the government is offering protective services to people like petitioner in these situations. Again, she did not report the abuse that she experienced and the immigration judge reasonably used those conditions to kind of bolster the findings there. Turning to Nexus, the agency found as a factual matter that the motive was an interpersonal dispute. Substantial evidence supports this conclusion. If we take petitioner at her word, she repeatedly testified on pages 114 to 116 of the record that her ex-partner got angry at her when she asked for money and lashed out in that way. We also know, again, once she was able to move out of his house, the only time when he again physically harmed her is when she returned in the custody dispute over the child. Under Rodriguez Zuniga and Parsimova, simply using the word woman as a term is a means to degrade petitioner certainly, but the evidence does not compel that her gender was the reason for that harm. As your honor stated, the fact that he turned toward Pedro, who is not a petitioner in this case, suggests that it is not necessarily her gender. And again, as long as these findings, as long as petitioner does not identify evidence compelling the alternative conclusion, we believe this petition for review should be denied. Unless the court has further questions, we're happy to rest on the arguments in our brief. All right. Mr. Jimenez, you have 30 seconds, but go ahead. I would just quickly note that we don't really need to engage in post hoc justification for the findings from the immigration judge. They're there. They know when the police failed to act, and that alone was not analyzed when reviewing the departure from the home, which was a punishment. And my time is done, your honors. All right. Thank you so much. Mateo Mateo versus Bondi will be submitted. We'll take, well, the next case is also submitted on the briefs, and we'll take up U.S. versus Barnes.
judges: WARDLAW, DESAI, ALBA